PEOPLE *v.* MARKHAM

1. TRIAL—JURY—COMMENTS—FACIAL EXPRESSION—PREJUDICE.

A juror's comment to another juror during trial that a certain defense witness made her sick, viewed in conjunction with the offending juror's purported facial expressions reflecting her unhappiness with, and disbelief of, that witness, did not constitute such an unequivocal statement of prejudice that the trial judge had a legal duty to interrogate that juror and his refusal to do so was not an abuse of discretion.

2. TRIAL—JURY—PREJUDICE.

A trial judge who observes occurrences in the courtroom and elsewhere is in a better position to determine the probability of any conduct on the part of the jurors or others being prejudicial to a defendant's rights than is a reviewing court.

3. TRIAL—JURY—BEHAVIOR.

A juror is entitled to react within the confines of proper decorum to the testimony presented.

REFERENCES FOR POINTS IN HEADNOTES

[1, 4]  53 Am Jur, Trial §§ 893, 899, 903.
[2]  53 Am Jur, Trial §§ 34, 848, 893.
[3]  53 Am Jur, Trial § 848 *et seq.*
[5]  21 Am Jur 2d, Criminal Law §§ 31–38.
[6]  53 Am Jur, Trial §§ 650, 661–665.
[7]  21 Am Jur 2d, Criminal Law §§ 333–344.
[8]  58 Am Jur, Witnesses §§ 657–661, 840, 841.
[9, 12]  21 Am Jur 2d, Criminal Law § 127 *et seq.*
[10, 11]  21 Am Jur 2d, Criminal Law § 53.
[13]  21 Am Jur 2d, Criminal Law § 127 *et seq.*
  5 Am Jur 2d, Appeal and Error § 545.

4. TRIAL—JURY—BEHAVIOR—COMMENTS—DISCRETION.

   Trial judge's refusal to interrogate a juror who allegedly made
   an uncomplimentary comment during trial to another juror
   regarding her dissatisfaction with a certain defense witness
   and also made facial expressions of disbelief in reaction to
   that witness's testimony was not an abuse of discretion even
   though the appellate court found that an interrogation of the
   offending juror would have been proper.

5. CRIMINAL LAW — DEFENSES — INSANITY — TEST — RIGHT-WRONG
   —IRRESISTIBLE IMPULSE.

   An accused is not responsible for his criminal acts if, by reason
   of disease, he is not capable of knowing he was doing wrong
   in committing a criminal act, or if he did not have the
   power to resist the impulse to do that act by reason of
   disease or insanity.

6. CRIMINAL LAW—DEFENSES—INSANITY—TEST—INSTRUCTIONS TO
   JURY.

   A trial judge who gives the "right-wrong" and "irresistible
   impulse" insanity tests when charging the jury does not err
   in refusing to give a defendant's requested instructions con-
   cerning the legal tests for insanity enunciated in federal court
   decisions.

7. CRIMINAL LAW — DEFENSES — INSANITY — WITNESSES — IM-
   PEACHMENT — RIGHT OF CONFRONTATION.

   A co-defendant's cross-examination of a psychiatric witness was
   properly allowed to protect the co-defendant's right of con-
   frontation where that witness's testimony regarding the sanity
   of another defendant not only had a direct effect on co-
   defendant's contention that he had acted under duress applied
   by the other defendant but also tended to inculpate the co-
   defendant while exculpating the defendant claiming insanity.

8. CRIMINAL LAW — DEFENSES — INSANITY — WITNESSES — EXPERT
   TESTIMONY — CROSS-EXAMINATION.

   A defendant whose defense is that he was temporarily insane
   when he committed the criminal act charged and who produces
   expert witnesses to testify to that insanity, opens the door
   for cross-examination of that expert witness on that subject.

9. CRIMINAL LAW—JOINT DEFENDANTS—SEPARATE TRIALS—DISCRE-
   TION.

   Defendants jointly charged with a crime may be tried separately
   or jointly in the discretion of the trial court under the statute
   relating to joint trials (MCLA § 768.5).

10. Criminal Law—Defenses—Insanity—Question of Fact.

A jury is the ultimate judge of a defendant's sanity at the time that he committed a crime.

11. Criminal Law — Defenses — Insanity — Witnesses — Expert Testimony — Other Evidence.

A jury is not bound by the testimony of an expert witness that a defendant was insane at the time that he committed the crime charged, even though that expert witness has not been cross-examined on that subject, where there is other evidence of defendant's behavior and state of mind from which the jury, being the ultimate judge of defendant's sanity, could have found defendant sane at the time that he committed the crime.

12. Criminal Law—Antagonistic Defenses—Separate Trials— Discretion.

Refusal to grant separate trials to joint defendants might be an abuse of discretion if the court has been fully advised that the defenses are inconsistent and antagonistic and if a defendant asserts this inconsistency before trial and moves for a severance.

13. Appeal and Error—Criminal Law—Antagonistic Defenses— Separate Trial—Estoppel.

An accused who relies upon temporary insanity as a defense and who asserts before trial that this defense does not affect his co-defendant, cannot benefit on appeal from any trial court error in denying him a separate trial where his own conduct contributed to that error because of his failure to make a good-faith disclosure before trial of the full scope of the antagonism between his and his co-defendant's defenses and his failure to move affirmatively, rather than defensively and as an alternative to other relief, for a separate trial.

Appeal from Wayne, John M. Wise, J. Submitted Division 1 June 10, 1969, at Detroit. (Docket No. 5,062.) Decided October 29, 1969. Application for leave to appeal filed November 17, 1969.

Larry Markham was convicted by a jury of kidnapping. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Joseph C. Murphy* and *Thomas P. Smith,* Assistant Prosecuting Attorneys, for the people.

*Joel M. Shere,* for defendant.

Before: FITZGERALD, P. J., and LEVIN and T. M. BURNS, JJ.

T. M. BURNS, J. Defendant was found guilty of kidnapping by a jury in Wayne county circuit court and sentenced to serve 25 to 35 years under MCLA § 750.349 (Stat Ann 1954 Rev § 28.581) by the Honorable John M. Wise. Defendant was jointly tried under MCLA § 768.5 (Stat Ann 1954 Rev § 28.1028) with Robert Rolston, who was also convicted and sentenced to serve 30 to 40 years.

The pertinent facts are that defendant and his co-defendant were in the Great Lakes Hotel and Bar in River Rouge on January 23, 1967. Defendant testified that Rolston wrote out a hold-up note instructing the barmaid to give defendant the money and that Rolston gave the note to her. Defendant then went into the back room and the barmaid followed. She gave him the money. Defendant then took her out to Rolston's car where she waited while he called Rolston out of the bar. They all proceeded to defendant's parents' cottage at Half Moon Lake where defendant had sexual intercourse with the victim. The defendant testified that his co-defendant went into the bedroom with the victim, but that he did not know if his co-defendant had sexual intercourse with her.

Defendant testified that after Rolston came out of the bedroom, Rolston told him that he (Markham)

would have to kill the barmaid since she knew him.
The three of them then left the cottage again in
Rolston's car which became bogged down because
the road was muddy.

Defendant testified that when the three of them
got out of the car, Rolston gave him a pistol and
told him to kill the barmaid, Mrs. Riddell. He then
testified that, with Rolston leading the way, they
went up a hill to kill Mrs. Riddell.

Defendant testified that he had told her to play
dead, and that when he fired his gun near her she
fell down in a faint. He then testified that he told
his co-defendant, "I killed her. Let's go;" but that
Rolston went over to her and, when he had deter-
mined that she was still alive, shot her twice in the
head.

At trial there were several witnesses who testified
as to the events which immediately preceded the
kidnapping, but no witnesses testified, except the co-
defendants, to the subsequent events leading up to
the murder.

Defendant relied on a defense of temporary in-
sanity at trial while his co-defendant claimed he
acted under duress by defendant.

Before trial, defendant's counsel, in response to
co-defendant Rolston's attorney's request to inter-
view defendant's psychiatric witnesses before trial,
moved to enjoin Rolston's counsel from introducing
evidence or cross-examining witnesses for the pur-
pose of impeaching defendant's defense of tempo-
rary insanity, or, in the alternative, to grant sep-
arate trials.[1]

---

[1] *Mr. Lippitt:* I would like to look at this file if I may, and
attempt to explain to the court in a reverse fashion.

Let's assume that Mr. Otis came into court today for a motion
for separate trials because he feels his client would be prejudiced.
I'm sure the court is well aware, within your discretion, you could
grant separate trials if you feel either one of the co-defendants would
be prejudiced and if I said I felt my client would be prejudiced

The trial judge denied the co-defendant's request to interview the psychiatric witnesses before trial. At trial the thrust of the testimony by the defend-

---

because Mr. Otis is attempting to cross-examine my client and put me in a position of not one prosecutor but several prosecutors. The court could grant my motion.

*The Court:* For separate trials?

*Mr. Lippitt:* For separate trials. My motion today is only in response to Mr. Otis' motion. He wishes to cross-examine my psychiatrist. He wishes to talk to my psychiatrist prior to trial. I say this medical evaluation of my client is personal to my client alone and has nothing to do with Mr. Otis or his client. If my psychiatrist were to get on the stand and explain or make a statement concerning the falsity of *res gestae* evidence, then I would say he'd have a right to cross-examine and interrogate. But my psychiatrist—I can inform the court, will be presented with a hypothetical question based on his reports. Mr. Otis can attack the evidence in the record. He can attack my client or any witness that takes the stand which reflects upon his client but my doctor's testimony concerns the personal state of my client and has nothing to do with the co-defendant. So I say to the court, unless my doctor says something that reflects on the evidence, then I am confronted with two prosecutors. If not, grant me a separate trial.

*Mr. Otis:* My response is that Mr. Lippitt has never asked for a separate trial.

*The Court:* Just a moment. He was saying "if".

*Mr. Lippitt:* I did in response to his motion.

*Mr. Otis:* I haven't asked for one, I haven't asked for one. I disagree completely that the mental condition of his client as testified to by a hypothetical question has benefit. The doctor's evaluation of those facts is very important. And it's not quite true we won't have the opportunity to cross-examine, if we had a separate trial because in point of fact I might insist on calling some of those witnesses and have the right to examine because of the nature of the defense. What order would the court give?

*The Court:* Gentlemen, so far as the order on the motion for separate trials is concerned, that's denied.

*Mr. Lippitt:* Thank you, your Honor, that we'll start right off with.

The Court: I believe, as I see it now, I would not rule on any testimony until I heard it and that's what you are asking me to do I don't think that Mr. Otis, at this time, has the right to interrogate your professional doctors until they have been sworn on the stand and are testifying as to the defendant's condition and then it's weighed, and then if the testimony of the psychiatrist is such that it affects his client, he has the right to interrogate further. So far as having a psychiatrist examine the defendant—

*Mr. Lippitt (interposing):* You see, your Honor, I still ask what relationship my client's condition is to his defendant.

*Mr. Otis:* They say my client did the deed.

*Mr. Lippitt:* Wait a second, if my witnesses reflect on his client— I'm talking about lay witnesses—certainly Mr. Otis has every opportunity to cross-examine them; but a doctor who testifies as to

ant's psychiatric witnesses was that defendant was a
passive schizophrenic who acted at the direction of
his older friend, who, although his name was not
mentioned, was obviously the co-defendant Rolston.

Since this amounted to testimony against co-
defendant Rolston and tended directly to refute his
defense of duress, the trial judge decided to allow
co-defendant's counsel to cross-examine in order to
protect his client's right of confrontation.[2]  See

---

his judgment concerning a man's mental state of mind, I can't see
how it affects his defense whatsoever.

*Mr. Otis:* I think you're wrong but he denied that anyhow.

*Mr. Lippitt:* But it might come up in trial and—

*The Court:* I'm not ruling on any questions that may be asked
at the time of trial. I am going to caution each of you that I'm
going to be running a tight court.

I'd like to know and I think, perhaps, you're requesting psy-
chiatric examination of the defendant, of Markham, because he's
used that as a defense. Now, there are two psychiatrists you are
going to have?

*Mr. Lippitt:* That's right.

*The Court:* Then I would suggest you have two psychiatrists.

*Mr. Murphy:* Would you present them to our psychiatrist for
examination?

*Mr. Lippitt:* If your Honor please, is this an oral motion the
court is going to consider?

*The Court:* He has just had the notice of insanity—

*Mr. Lippitt (interposing):* Yes, over two weeks.

*Mr. Murphy:* Apparently it has been in the file.

*The Court:* He's entitled to an examination. I just went through
that and I know what the law is on that.

2 *The Court:* All right.

*Mr. Otis:* While we are on the record here, I would like to get
a ruling from the court regarding the cross-examination of Dr.
Altshuler here. I would like to point out we had discussions from
the beginning of this trial and at those times, the Court indicated
he did not feel I had a right to examine him. I felt I may be able
to cross-examine him concerning the history at least. I would like
to point out the doctor has referred to so-called dependency on a
certain individual at the age of ten, which he has referred to two
or three times. In view of the use of "Big Brother", if I'm going
to cross-examine, your Honor, I think I should have full scope and
cannot be limited to two areas.

*The Court:* In view of the testimony of today and the difficulty
at the age of ten which coincides somewhat with your client, Mr.
Otis, I believe you are entitled to cross-examination as to what the
defendant may have told the doctor and their relationship. How-
ever, to go into full cross-examination as to his mental capacity at
the time of the commission of the offense, this being an affirmative

*Pointer* v. *Texas* (1965), 380 US 400 (85 S Ct 1065, 13 L Ed 2d 923). He emphasized, however, that the burden of refuting the defense of temporary insanity remained on the prosecution.

---

defense, would be the responsibility of the prosecuting attorney and that's my ruling.

*Mr. Otis:* The question is, your Honor, do I have any right and it's as simple as this. I said it before the trial and I think it's coming out now through the testimony of the doctor, what the theories of defendant Markham is on the evening in question this defendant Markham was acting under a compulsion and he did all of this at the insistence of defendant Rolston. This is apparently a mental disease he has and I want an opportunity to fully clear this doctor's diagnosis and opinion because it's quite relevant to defendant Rolston's defense.

*The Court:* Let me point this out to you. Mr. Lippitt has indicated he doesn't want two prosecutors cross-examining the psychiatrist. In a manner of speaking, he's right in his assumption but here we are in a position of trying to get the truth and professional opinion of the psychiatrist before this jury. If the opinions are faulty, the jury should know that. If they're not faulty, of course, then they will bear up under cross-examination. The thing that comes to my mind is that the cross-examination from the medical standpoint, that is the burden of the prosecution and isn't putting the defendant Markham at a disadvantage by having two prosecutors go into the claim of being competent beyond a reasonable doubt at the time of the commission of the offense. Now, so far as your client is concerned, I'm going to allow you to go into the testimony and cross-examine the witness relative to what was told him by the defendant; also his reference to this person who all of us know seems to be without naming him, a reference to your client. I'm going to allow you to go into that.

*Mr. Otis:* My only point is psychiatrically you cannot distinguish in areas.

*The Court:* You may have to go a little further. I'm trying to keep it to a narrow line. It's not your position as representing a co-defendant to try to show the mental incompetency of this defendant.

*Mr. Otis:* The question is, your Honor, was he capable of performing certain judgment or was he acting as a passive individual.

*The Court:* May I say this. You may cross-examine and in conformance with your theory as to whether or not he could have been in a position as to what you indicated to the jury, you're intending to prove, to wit that defendant Markham was forcing him to do all these things. From that standpoint, certainly that's admissible and according to the line I have drawn. Anything further?

*Mr. Lippitt:* I don't want to repeat my objection concerning this matter.

*The Court:* Your objection has been noted on the record. I have cautioned Mr. Otis that there is a narrow line. I appreciate that but at the same time he has a right to cross-examine in view of the statements of the doctor in the manner in which he testified.

Defendant's counsel renewed his objection to such cross-examination at that time and further asked that one of the jurors be disqualified for alleged prejudice against one of defendant's witnesses.[3]

You didn't ask him specifically but he did testify so he's opened the door and having opened the door I'm going to allow Mr. Otis to go as close as possible.

*Mr. Lippitt:* May I say, your Honor, I have no further desire to continue my objection. I merely would like to make certain the court understands I'm repeating my objection.

*The Court:* You don't have to repeat it. Your objection is noted on the record and in view of the court's ruling, you have no alternative but to proceed.

[3] *Mr. Lippitt:* Yes, your Honor, and number two, Mrs. Goldman, who I note from my *voir dire* examination is married to a physician made a comment to the effect that the court's ruling was the correct ruling. She said "That's right". Very shortly thereafter, as I was interrogating the doctor, this same juror turned to juror number one and as I was standing in close proximity to juror number one, very close to the jury box, as I was asking my questions and she stated "He makes me sick" loud enough for me to hear it. I believe, if the court please, that this juror has violated her oath as a juror and she has formed a conclusion and an opinion about a witness prior to deliberations and I would ask the court that this juror be disqualified at this time and be dismissed from the jury panel. I am afraid if she is not disqualified, she may contaminate the remaining jurors.

*The Court:* Mr. Lippitt, you indicated to the court yesterday that you took a calculated risk by allowing a doctor's wife to sit on this jury.

*Mr. Lippitt:* No question about it, your Honor.

*The Court:* All right, I didn't hear the juror say that nor did you, Mr. Otis.

*Mr. Otis:* I did not.

*The Court:* Nor did you, Mr. Eggleton?

*Mr. Otis:* I would say this, however, your Honor, while I do not join in Mr. Lippitt's motion, I did, as a matter of fact, after this was brought to the court's attention, watch this particular juror and I did notice facial expression and disbelief and unhappiness with the witness. I bring that to your attention.

*The Court:* I do not doubt Mr. Lippitt's statement, however, anyone in the courtroom could have said it. I do believe if I would interrogate her at this time, it certainly would be error and this jury trial is in its third week of duration and this is not time to be interpreting facial expressions either to advantage or disadvantage. Facial expressions do happen. I don't think it's sufficient grounds for a mistrial or sufficient grounds for me to disqualify this juror. I have cautioned the jury from time to time. I don't think there's a day goes by I haven't cautioned the jury not to discuss this among themselves or anyone else.

*Mr. Eggleton:* Your Honor, while I didn't hear this witness say this and while I didn't see the facial remark [*sic*], I should think that if there's any possibility of her prejudiced in this matter, if

The trial judge decided that although he did not doubt defendant's attorney's statement as to what was said by the juror, such a statement was not grounds for a mistrial nor sufficient grounds to disqualify the juror.

At the conclusion of the proofs, defendant submitted along with his other requested charges several which related to defendant's defense of temporary insanity. He requested that in addition to the "right-wrong" and "irresistible impulse" tests the court charge the jury under what he called the "more modern rules" enunciated in *Durham* v. *United States* (1954), 94 App DC 228 (214 F2d 862, 45 ALR2d 1430) and *United States* v. *Currens* (CA3, 1961), 290 F2d 751. The trial judge refused.

We note that the trial judge here gave careful and detailed instructions to the jury as to both defendants' theories of the case and in all other aspects of the case. The jury after some deliberation asked to see defendant's hospital record. The trial judge at the time reiterated his instructions as to participants in a crime. He went on to say:

"You are to consider the case of the defendants separately. However, in order to convict either defendant of the charge made against him in this information, there must be evidence against such defendant which convinces you beyond a reasonable doubt of the guilt of that particular defendant. While these defendants were tried together and were charged with a joint offense, it is necessary that the

---

it's possible, I would stipulate that among the two who are to be withdrawn from the list this should be one.

*Mr. Otis:* I'm absolutely opposed to that.

*The Court:* I can't do that because it's not sufficient to interrogate this juror. If I should interrogate this juror separately it would just bring the whole trial in a position where all the jurors will be concerned as to what did happen. It would highlight a remark that might have been said and it may not have been said to the detriment of your defendant at all, Mr. Lippitt, and it certainly would deter this trial.

evidence shall be given against each one of them and it is within the power of the jury and it is also the duty of the jury to consider the case of each defendant separately as though he were on trial here alone. If the evidence is not sufficient to convict him, no matter whether it is sufficient to convict the other defendant or not, then you should consider the case of each one just the same as if he were on trial alone and you can render a verdict with regard to one which may be one way and with regard to the other which may be the other way."

The jury then retired to deliberate and returned guilty verdicts against both defendants within an hour.

On appeal, defendant raises three questions for our consideration which are considered and disposed of separately.

*Did the Trial Judge Err in Denying Defendant's Motion to Disqualify a Juror on the Grounds of That Juror's Alleged Bias Towards One of Defendant's Witnesses?*

The defendant claims on appeal that the juror's alleged remark as presented in footnote 3 imposed a legal duty upon the trial judge to interrogate the juror.[4]

Certainly, as the appellant notes citing *People* v. *Schram* (1965), 1 Mich App 279, 284:

"The rule is well stated in *People* v. *Levey* (1919), 206 Mich 129, at pages 130 and 131: 'Both the people and defendant were entitled to a trial by a fair, impartial, and unprejudiced jury.'"

---

[4] Appellant notes that his motion was only to disqualify this juror not to declare a mistrial, and he therefore claims there was no attempt to abort the trial which was in its third week. Yet, we note that appellant had already, as had his co-defendant, moved for a mistrial on other grounds not raised in the appeal. Therefore, we will treat this denial of a motion for mistrial. Such motions are directed to the trial judge's discretion. *People* v. *Nick* (1960), 360 Mich 219, 224; see also *People* v. *Finehout* (1969), 16 Mich App 15.

See generally *People* v. *Freeman* (1969), 16 Mich
App 63, 70. We note that neither this Court nor
the Supreme Court of this state which affirmed
*People* v. *Schram, supra,* in (1966), 378 Mich 145,
found reversible error in the trial court's denial of
a mistrial. See also *People* v. *McDonald* (1969), 17
Mich App 88.

The rule of the *Schram* case as followed by this
court in *People* v. *Qualls* (1968), 9 Mich App 689,
693:

"[I]s that not every improper contact with a jury
presents grounds for a mistrial, and the appellate
court will reverse only when prejudice is affirma-
tively shown or facts clearly establish the inference
that it occurred from what was said or done."

In the *Schram* case, the prosecuting attorney had
conversed with two of the jurors; and in *Qualls,* a
manslaughter case, the victim's brother had strongly
criticized the defendant's counsel in the presence of
some of the jurors.

Unlike the cases upon which appellant relies,[5] here
we have no such colorably improper contact or out-
side prejudicial influence. The alleged comment of
the juror viewed in conjunction with purported facial
expressions is not an unequivocal statement of prej-
udice like that found in *People* v. *Sharp* (1910), 163
Mich 79, 80. Nor are we persuaded that the trial
court abused its discretion under *People* v. *Bartlett*
(1945), 312 Mich 648. Although we do not share the
trial judge's view that it would have been reversible
error to have interrogated the juror as to possible
prejudice, we do not find that he clearly abused his
discretion in refusing to do so. See *People* v. *Bergin*
(1969), 16 Mich App 443, 448. The Supreme Court
in *People* v. *Schram, supra,* p 159, compared the

5 *People* v. *Schram* (1965), 1 Mich App 279; *People* v. *Levey*
(1919), 206 Mich 129.

situation before it to *People* v. *Nick* (1960), 360 Mich 219, and derived its rule therefrom. Consequently, we turn to the *Nick* case and rely on it as the touchstone for deciding cases of this type. The Court in *Nick, supra,* p 224 said:

"The judge presiding throughout the trial and observing the occurrences in the courtroom and elsewhere was in a better position to determine the probability of any conduct on the part of jurors or others prejudicial to the rights of the defendant than is this Court."

The trial judge throughout the trial advised the jury against discussing the case amongst themselves or with anyone else, and against expressing any opinions. We find that "a juror is entitled to react within the confines of proper decorum to the testimony presented." *People, ex rel Adams,* v. *Moran* (1962), 35 Misc 2d 1078 (232 NYS2d 201, 203). Noting that in the *Nick* case there was no interrogation of jurors, we find that although an interrogation of the juror in question here would have been proper, the trial judge's refusal to interrogate the juror under the circumstances of this case was not a clear abuse of his discretion. See also *De Corte* v. *New York Central R. Co.* (1966), 377 Mich 317, 351 (Justice BLACK's separate opinion). Since there is no clear abuse of discretion, we will not reverse.

*Did the Trial Court Err When it Refused to Give Defendant's Requested Charges Concerning the Legal Tests of Insanity Enunciated in* Durham *v.* United States, supra, *and* United States v. Currens, supra, *in Addition to the "Right-Wrong" and "Irresistible Impulse" Tests?*

Whatever may be the law elsewhere, including the federal courts, the law in Michigan is clear. This court said in *People* v. *Cole* (1967), 8 Mich App 250, 256, 257:

"Defense counsel requested the trial court to charge the jurors on the defense of insanity in accord with the *Durham* rule, whereby an accused is not criminally responsible if his unlawful act is the product of a mental disease or defect. Whatever may be the appeal of the *Durham* test of legal insanity, we feel constrained to uphold the longsettled Michigan tests. The charge given the jury was in accord with that approved in *People* v. *Durfee* (1886) 62 Mich 487, 493: 'If, by reason of disease, the defendant was not capable of knowing he was doing wrong in the particular act, or if he had not the power to resist the impulse to do the act by reason of disease or insanity, that would be an unsound mind;' thus, a mind not criminally responsible. We may speculate that the Supreme Court may some day adopt the *Durham* rule or return to the 'incapability of criminal intent' test set out in *People* v. *Garbutt* (1868) 17 Mich 9. See *People* v. *Krugman* (1966) 377 Mich 559. However, we are not free to act on this speculation and alter the long approved *Durfee* test."[6]

See also *People* v. *Morris* (1968), 10 Mich App 526.

---

[6] Commenting on the *Cole* case, Professor Edward M. Wise of the Wayne State University Law School in his most recent survey of Michigan criminal law in 15 Wayne L Rev 201, 217–228:

"The court might also have said in *Cole* that the *Durham* rule is not likely to give a jury 'any guidance that perceptibly would help.' The rule starts, rightly enough, from the premise that it makes no sense to punish someone for being sick. But unless the accused's sickness is somehow connected with the crime charged, he has not in any significant sense been punished for being sick. Thus the *Durham* rule emphasizes that the accused's act and his abnormal mental condition must be connected by requiring that the one be a 'product' of the other. It does not say, however, precisely what sort of connection is required. The rule properly allows psychiatric witnesses a fairly loose rein in their testimony, but it leaves unclear what it is they are testifying to, and what standards should be used to evaluate their evidence. The *Durham* test is really meaningless unless the principle on which it makes no sense to punish someone for being sick is specified. But this principle is nothing other than the notion that it would be pointless and unjust to punish an offender who simply could not avoid breaking the law, which is already the controlling test of mental incapacity in Michigan. In fact, subsequent elaboration of the *Durham* rule in the District

We find that the so-called *Currens* test and the Model Penal Code test (Model Penal Code § 4.01) also advocated by the defendant, on appeal, can be disposed of in a like manner, along with the *Durham* test.

We find that the trial court did not err in its instructions as to the legal tests of insanity under present Michigan law.

*Did the Trial Jurge Err in Denying Defendant's Motion to Restrain Rolston's Attorney from Attempting to Impeach Defendant's Defense of Temporary Insanity, or in the Alternative, Grant Him a Separate Trial?*

As noted, the defendant's motion before trial was in response to his co-defendant's request to examine defendant's proposed witnesses on the insanity defense. The trial judge refused to allow these witnesses to be interviewed (thus giving the defendant the substance of his request); but refused to decide before trial whether co-defendant's counsel would be completely barred from cross-examining them. Although thus forewarned that cross-examination by co-defendant's counsel of defendant's psychiatric witnesses might be allowed at the trial, the defendant's counsel did not seek before trial a separate trial independently of his alternative motion which was granted in substance.

As the testimony of Dr. Altshuler, one of defendant's psychiatric witnesses, developed in direct examination, it became clear that it had a direct effect

---

of Columbia has turned it into something very much like the Michigan test. Indeed, all the competing tests of criminal responsibility tend to converge towards the principle that the law should stay punishment of a man whose mental abnormality prevented him from obeying its commands. It may even be that the precise words in which the test is put are not nearly so important as the extent to which expert testimony gives the jury a complete account of the peculiar incapacities under which the accused labored." (Footnotes omitted.)

on co-defendant's defense of duress and tended to inculpate the co-defendant while exculpating the defendant.[7] We find that the trial court was correct when it allowed the co-defendant to cross-examine this witness once the defendant had so "opened the door." The co-defendant's right of confrontation could not have been protected otherwise. Compare *Bruton* v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476); *Pointer* v. *Texas, supra; People* v. *Patton* (1968), 15 Mich App 198: See also *Harrington* v. *California* (1969) 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284); *People* v. *Havey* (1968), 11 Mich App 69, 77; *People* v. *Lewis* (1967), 6 Mich App 447.[8]

In *Lipscomb* v. *State* (1968), 5 Md 500 (248 A2d 491), the Maryland court was faced with a situation similar to ours in that one of the defendants attempted to exculpate himself at the other's expense. The court said, p 504:

"Lipscomb testified on his own behalf that he had first seen Miss Williams on a Friday, about five days prior to the date of the alleged crimes, at the Grey-

---

[7] *Q.* Did you discuss with Larry Markham his relationships in adolescence with adult males?

*A.* Yes, there was a reference made, he made it, to a friendship which he has developed to a certain individual approximately at the age of ten. Since he was rejected by his father, he felt rejected by his father, he was looking for some attachment and this individual who was ten years older than he was at the time, and they developed a friendship, the older man was sort of a brother, perhaps, an image of father, and he looked up to him. Really, he really worshipped this individual and was very much dependent upon him. * * *

*Q.* Doctor, do you have an opinion, based on reasonable medical certainty as to whether or not Larry Markham was suffering from a mental disease or defect at the time this crime was allegedly committed, caused or led to his participation in this?

*A.* Yes, he was suffering from a mental disease, sir.

[8] *Bruton* v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476), made retroactive and effective against the states in *Roberts* v. *Russell* (1968) 392 US 293 (88 S Ct 1921, 20 L Ed 2d 1100), and determined that the crucial right is that of confrontation; i.e., the right to cross-examine.

hound Bus Terminal with her girlfriend, Linda Smith; that he was invited by the girls to Miss Williams' apartment where he kissed the prosecutrix; that he returned to her apartment on July 16 and had consensual sexual relations with her, stealing her watch at the conclusion of the intercourse; and that while he never again saw Linda Smith, he did receive a Christmas card from her, which contained five dollars and her photograph. These items were admitted into evidence.

Eric Dabney then testified and his testimony closely corresponded to that of the victim. He attested to Lipscomb's sexual acts upon Miss Williams and the theft of her watch and ring. On cross-examination, he testified that Miss Williams struggled throughout the incident, and that he was compelled to hold her leg at one point so that Lipscomb would not become angered and kill her.

Appellant contends that the testimony of Dabney, his jointly-indicted co-defendant, was instrumental in the finding of his guilt and thereby prejudiced him. He asserts that consideration of Dabney's testimony at the joint trial vitiated his opportunity for a fair determination on the question of guilt or innocence because of the strong inclination of a co-defendant to give testimony incriminating his co-defendant and exonerating himself. In support of this contention, appellant relies upon *Bruton* v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476)."

The court went on to say, p 506:

"We think it clear  *  *  *  that the constitutional predicate underlying *Bruton* is the Sixth Amendment right of the accused to confront and cross-examine the witnesses against him. The present case is unlike *Bruton,* however, since here the confessing co-defendant, Dabney, did testify at the trial, and was cross-examined by the appellant, so that

his Sixth Amendment right to confront and cross-examine Dabney was not violated."

So also in our case, the defendant's as well as the co-defendant's right of confrontation was protected.

Much interest has been generated in this area of joint trials in recent years, especially since *Bruton* v. *United States, supra.* And, as was said in *Spencer* v. *Texas* (1967), 385 US 554 (87 S Ct 648, 17 L Ed 2d 606), "all joint trials * * * furnish inherent opportunities for unfairness." However, under our present statute, defendants jointly charged may be tried separately or jointly in the discretion of the trial court. MCLA § 768.5 (Stat Ann 1954 Rev § 28.1028).[9]

Before the repeal of CL 1915, § 15829 in 1927, and the substitution of the present statute, a defendant charged with a felony had a right on request to be tried separately. The Supreme Court said in *People* v. *Foster* (1933), 261 Mich 247, 255, that "the right to separate trial, given by the former statute, was valuable to the accused. *People* v. *Dimitru* (1923), 224 Mich 670. But it was a statutory procedural right which the legislature could abrogate." The Supreme Court recently in *People* v. *Schram, supra,* pp 154, 155 reaffirmed the position it took in *Foster, supra.*

The defendant claims that the cross-examination of his psychiatric witness went far beyond the "permissible area of cross-examination" consequently prejudicing his defense of temporary insanity.

We agree with defendant that the value, if any, of the testimony of Dr. Altshuler, his psychiatric

---

[9] *People* v. *Duplissey* (1968), 380 Mich 100. In this case there were four co-defendants, three of whom created an uproar and had to be gagged and shackled in front of the entire jury panel. Although appellant was not involved in this uproar, he was also shackled. His counsel moved for a separate trial, but was denied. The Supreme Court found prejudice in the denial, saying that it found a clear abuse of discretion under those circumstances.

634 19 MICH APP 616 [Oct

witness, was substantially undercut by the co-defendant's counsel's extremely able cross-examination. After a careful review of the record, we do not consider that co-defendant's counsel went beyond the permissible area of cross-examination as set by the trial judge.

We find that since "the jury is the ultimate judge of defendant's sanity at the time of the crime, and in this case, since it had before it evidence of defendant's behavior and state of mind upon the basis of which it could have found defendant sane at that time, it was not bound by the expert testimony of the doctor" (*People* v. *Krugman* [1966], 377 Mich 559, 563), even in the absence of any cross-examination.

Further, we find that even if the trial court erred in the scope of cross-examination allowed co-defendant's counsel, such error would be harmless error in view of the weight of other evidence, particularly defendant's own testimony under direct examination. See *People* v. *Liggett* (1967), 378 Mich 706; *People* v. *Wichman* (1968), 15 Mich App 110, 116. See also *Harrington* v. *California, supra,* and *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705).

Under the facts of this case, the denial of defendant's motion for separate trials was not a clear abuse of the trial court's discretion. See *People* v. *Duplissey* (1968), 380 Mich 100, in light of *People* v. *Schram, supra; People* v. *Krugman, supra; People* v. *Kynerd* (1946), 314 Mich 107, and *People* v. *McIntosh* (1967), 6 Mich App 62.

Since the co-defendant's defenses were inconsistent, and in fact antagonistic, had the trial court been fully advised, and had the defendant asserted

this inconsistency before trial, it might have been an abuse of discretion not to grant separate trials. See generally *People* v. *Kynerd, supra,* p 112.

Although co-defendant alleged that defendant's defense of temporary insanity was antagonistic, defendant before trial asserted that his defense did not affect his co-defendant. (See footnote 1.)

Had defendant made a good faith disclosure of the full scope of the antagonism between his and his co-defendant's defenses before trial, and had he affirmatively (not defensively and alternatively) moved for separate trial, we would be faced with an entirely different matter if the trial judge had under those circumstances denied severance.

We will not allow the defendant to have the benefit of error, if there was such, caused in our view at least in substantial part by his own conduct. Finding no reversible error, we affirm the defendant's conviction.

Affirmed.

All concurred.