## PEOPLE v. GRAHAM

1. CRIMINAL LAW—DEFENDANT TESTIFYING—PRIVILEGE AGAINST SELF-INCRIMINATION—WAIVER—CROSS-EXAMINATION.

A defendant who voluntarily takes the stand in his own defense waives his constitutional right to refuse to answer any questions which might tend to incriminate him and can be subjected to cross-examination concerning the facts in the case and those affecting his credibility.

2. CRIMINAL LAW—PRIVILEGE AGAINST SELF-INCRIMINATION—POLICE COMMENT ON RIGHT.

Permitting a police officer, on rebuttal, to testify that the defendant said that he had nothing to say after being given the proper warning of rights and after being asked if he wanted to tell his side of the alleged robbery was not prejudicial error where the defendant himself opened the door to such testimony when he stated on direct examination that he attemped to tell the officers his true account of how the incident took place and that no one would listen to him and that he had told his story to the jail's turnkey, thus placing his own credibility in issue, and where there was overwhelming direct evidence that the defendant committed the crime charged.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law §§ 357–359, 362, 367.
[2, 3] 21 Am Jur 2d, Criminal Law §§ 356, 366.

3. CRIMINAL LAW—PRIVILEGE AGAINST SELF-INCRIMINATION—HARM-
   LESS ERROR.

    Permitting a police officer to testify at the defendant's trial for
   armed robbery that the defendant, after being advised of his
   constitutional rights and after being asked if he wanted to
   tell his version of the robbery, stated that he had nothing to
   say was, even assuming the testimony violated the defendant's
   constitutional rights, harmless error where there was over-
   whelming direct evidence against the defendant (US Const,
   Am 5).

Appeal from Recorder's Court of Detroit, Henry L. Heading, J. Submitted Division 1 November 9, 1970, at Detroit. (Docket No. 7892.) Decided January 20, 1971.

Eugene Graham was convicted of armed robbery. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow* (Defenders' Office—Legal Aid and Defender Association of Detroit), for defendant on appeal.

Before: McGREGOR, P. J., and HOLBROOK and O'HARA,* JJ.

HOLBROOK, J. On July 1, 1967, defendant Eugene Graham was found guilty by a jury in the Re-corder's Court for the City of Detroit of the felony

---

    * Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

of robbery armed, MCLA § 750.529 (Stat Ann 1970 Cum Supp § 28.797). Defendant was sentenced on July 16, 1967, to a prison term of from 15 to 30 years. A motion for new trial was made on July 31, 1967; the motion was denied on January 23, 1968. Defendant has taken this appeal and raises a single issue for determination by this Court, viz:

Did the trial court commit prejudicial error by denying defendant's motion for a mistrial after a police officer on rebuttal testified that the defendant had nothing to say after being given the proper warnings under *Miranda?*[1]

The pertinent facts necessary to a decision here include the following: the complainant, Virginia Bohlen, owner and operator of a donut shop, testified that the defendant was the man who came into her store on the early morning of February 12, 1966, and ordered some donuts which she put in a bag. Her testimony is in part as follows:

"*Q.* And what happened then, Mrs. Bohlen?

"*A.* Then he went to pay for them, and with that, it was so fast, so help me I didn't see where that knife came from, but there it was right on the counter.

"*Q.* Tell the court and jury please, Mrs. Bohlen, what happened then?

"*A.* He said, 'You know what that is'. And of course I knew exactly what it was, it was—I don't know if it was a switch-blade knife, but it was a knife that was open, and it was a good length.

"*Q.* What did he do, Mrs. Bohlen?

"*A.* He had grabbed my wrist, holding my wrist real tight, as I went to reach for his money—

"*Q.* Which wrist did he hold?

"*A.* He grabbed my right wrist holding me real tight.

---

[1] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

"*Q.* With which of his hands did he grab hold of the right wrist?

"*A.* He was—the opposite hand, it would be his left hand, wouldn't it? With his left hand, his right hand still had the knife. His right hand had the knife, he grabbed me with his left hand, grabbing my right wrist.

"*Q.* And what did he do then, if anything?

"*A.* He said,—well, he wanted the cash register emptied, which I did. Gave him—started out with the quarters.

"*Q.* Did he say anything to you, Mrs. Bohlen?

"*A.* Yes, after I gave him the money he had.

"*Q.* No, before you gave him the money, did he say anything to you?

"*A.* No, nothing more than that I wasn't going to argue with him.

"*Q.* Did he do anything with the knife, save hold it in his hand?

"*A.* Pardon?

"*Q.* Did he do anything with the knife except hold it in his hand?

"*A.* Just held it in his hand, like so.

"*Q.* What happened then, Mrs. Bohlen?

"*A.* I hit the register with my left hand, hitting the no sale; it opened. I proceeded to drag out the quarters, dimes and nickels. I put them on the counter, putting the dollar bills. He says, 'I want you to pile all that money on the bills', which I did; piled it all on the bills so that he could scoop it up with one hand.

"*Q.* And what happened then, Mrs. Bohlen?

"*A.* He put it into his pocket.

"*Q.* He did scoop up the money?

"*A.* Yes, sir."

At about that time, two policemen passing the donut shop observed what was taking place and went into the shop and arrested the defendant and the money was found in his coat pocket. Defendant

took the stand and testified that he had been shooting dice shortly before he had entered the donut shop and went into the shop to get the change he won in the crap game changed into bills. He testified that he pulled the change from his pocket and the knife was among the change. When he retrieved the knife and asked the plaintiff for bills in exchange for change she misunderstood him and thought that he was robbing her and that complainant took the money from the register and threw it on the counter and told him to take it but not to hurt her. He tried to tell her that he was not robbing her and he reached for her wrist when she became hysterical. When she would not calm down, he decided to get out. He picked up the money and was about to leave when the police entered and arrested him. The defendant testified that the officers abused him and when they called for additional help he testified, "What do you need help for?—All you've got to do is let me explain". Then when the other officers came with the squad car, the defendant testified:

"And when I again tried to attempt to tell them what had happened, my face was banged against the wall several times,  *  *  *  ."

He further testified that on the way to the precinct in the automobile he attempted to explain to them again what had happened and he was refused. He further testified that he was hit and kicked by the officers. Defendant also testified that the next day he talked to Walter Williams, the turnkey at the jail, and that he told him from the beginning to the end the same story that he testified to at the time of the trial. The defendant called Walter Williams as a defense witness. Mr. Williams testified in pertinent part as follows:

"*Q.* Now, do you know Eugene Graham?

"*A.* Personally, no, I don't.

"*Q.* Do you recall seeing him on or about February the 13th, 1966, on the 9th floor?

"*A.* Yes, I can recall that much of it. Yes.

"*Q.* Do you recall noticing his condition—his physical condition?

"*A.* Yes. At the time he was brought in there appeared to be some swelling about his head. Which areas I can't go into detail, or elaborate on.

"*Q.* Do you know whether it was his head or his eye?

"*A.* If I recall correctly, I believe it was one of his eyes.

"*Q.* One of his eyes?

"*A.* Yes.

"*Q.* There was swelling?

"*A.* Yes, were swelling.

"*Q.* Did you discuss how he happened to get that way?

"*A.* No. Like I said before, this happened sometime ago, and I can't recall all of the details of it.

"*Q.* But you do recall the swelling?

"*A.* Yes, I do."

The witness was not questioned either on direct examination or cross-examination concerning whether the defendant told him his story of how the incident took place. Police officers Dujardin and Bempke testified that when they were passing the donut shop they saw the defendant grabbing the proprietress by the neck. They circled the block and then went into the shop where they saw that the defendant had the complainant by the right hand. When they announced that they were police officers, the defendant threw a knife to the floor and then raised his hands. Upon searching defendant's person, they found assorted bills and change in his topcoat pocket. They examined the cash register, opened the drawer,

and found some pennies in there and a roll of dimes. One of the officers picked up the knife and closed it and put it in his pocket.

Two witnesses corroborated defendant's part of his story to the effect that he had been to an after-hours place of business and won some money in a crap game and had loaned the witnesses $10 and $6 before leaving the place. The two arresting officers on cross-examination were not questioned as to whether or not the defendant attempted to tell them his version of what had taken place in the donut shop.

Mr. Knobelsdorf and Mr. McMahon of the Detroit Police Department testified that they were called to the donut shop and after arrival there took the defendant in a squad car to the Mack-Gratiot station and placed him in the lockup room. Mr. McMahon was cross-examined by defendant's counsel in part as follows:

"*Q.* All right. Now when you conveyed Graham to the station, did he try to talk to you?
"*A.* No.
"*Q.* Did he try to explain to you what happened, did you tell him to shut up?
"*A.* No, I didn't.
"*Q.* Did you have any conversation with him on the way to the station?
"*A.* No, I didn't.
"*Q.* You want to tell the jury that all the way down there not one word was said?
"*A.* I said nothing to the defendant.
"*Q.* Did you hear anything said?
"*A.* No, I didn't.
"*Q.* All the way down you didn't ask him whether he did it; why he did it; try to get a confession out of him, nothing, is that what you want the jury to believe?
"*A.* That wasn't my job to get a confession.

"*Q.* It wasn't—wasn't your job?

"*A.* No.

"*Q.* Whose job was it?

"*A.* That's detective work.

"*Q.* Oh. So the policemen don't ask a defendant whether he did it, they want [*sic*] until they bring him to the detectives, is that what you want to tell us?

"*A.* That's what I'm telling you happened in this case."

Defendant asserts that it was prejudicial error for Hector Baeyens, a detective of the police department, to testify on rebuttal concerning what took place between him and the defendant at one o'clock on the day of the offense and arrest, February 12, 1966. The pertinent portion of the testimony objected to by defendant appears in the transcript as follows:

"*Q.* You had conversation?

"*A.* Yes.

"*Q.* What did you say to the defendant, if anything?

"*A.* I told the defendant that I was going to prepare a transfer on him and I was going to send him down to the hold-up bureau.

"*Q.* Keep your voice up, please, witness, so that all might hear.

"*A.* All right. I'm sorry. I told the defendant that I was going to prepare a transfer on him and have him sent down to the hold-up bureau for further investigation. I also told the defendant that I was going to make a request for a warrant and I asked the defendant if he wanted to tell me his side of the story.

"*Q.* Did the defendant reply to you?

"*A.* Yes, he did.

"*Q.* What reply did he make?

"*A.* He said he had nothing to say."

Defendant's position is predicated on the rulings in the cases of *Grunewald* v. *United States* (1957), 353 US 391 (77 S Ct 963, 1 L Ed 2d 931); *Stewart* v. *United States* (1961), 366 US 1 (81 S Ct 941, 6 L Ed 2d 84); *Malloy* v. *Hogan* (1964), 378 US 1 (84 S Ct 1489, 12 L Ed 2d 653); and *People* v. *Hicks* (1970), 22 Mich App 446. These cases are authority for the general rule that the Fourteenth Amendment to the Federal Constitution is applicable to the Fifth Amendment privilege to remain silent unless a person wishes to speak in the unfettered exercise of his own will and to suffer no penalty for such silence.

In *Grunewald, supra,* the Supreme Court held that it was prejudicial error to permit cross-examination of the defendant eliciting the fact that he had pleaded the Fifth Amendment before a grand jury in regard to the same questions which he answered at trial consistent with innocence. Specifically it is stated in the opinion on pp 418–420 in part as follows:

"It is, of course, an elementary rule of evidence that prior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent. 3 Wigmore, Evidence, § 1040. And so the threshold question here is simply whether, in the circumstances of this case, the trial court erred in holding that Halperin's plea of the Fifth Amendment privilege before the grand jury involved such inconsistency with any of his trial testimony as to permit its use against him for impeachment purposes. We do not think that *Raffel*[2] is properly to be read either as dispensing with the need for such preliminary scrutiny by the judge, or as establish-

2 *Raffel* v. *United States* (1926), 271 US 494 (46 S Ct 566, 70 L Ed 1054).

ing as a matter of law that such a prior claim of privilege with reference to a question later answered at the trial is always to be deemed to be a prior inconsistent statement, irrespective of the circumstances under which the claim of privilege was made. The issue decided in *Raffel* came to the Court as a certified question in quite an abstract form, and was really centered on the question whether a defendant who takes the stand on a second trial can continue to take advantage of the privilege asserted at the first trial. This Court held, in effect, that when a criminal defendant takes the stand, he waives his privilege completely and becomes subject to cross-examination impeaching his credibility just like any other witness: 'His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing'. The Court in *Raffel,* did not focus on the question whether the cross-examination there involved was in fact probative in impeaching the defendant's credibility. In other words, we may assume that under *Raffel* Halperin in this case was subject to cross-examination impeaching his credibility just like any other witness, and that his Fifth Amendment plea before the grand jury could not carry over any form of immunity when he voluntarily took the stand at the trial. This does not, however, solve the question whether in the particular circumstances of this case the cross-examination should have been excluded because its probative value on the issue of Halperin's credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury."

The last pronouncement on this subject by the Michigan Supreme Court is set forth in the case of *People* v. *McCrea* (1942), 303 Mich 213, which ruled that a defendant when he voluntarily takes the stand in his own defense waives his constitu-

tional right to refuse to answer any questions which might tend to incriminate him and can be subjected to cross-examination concerning the facts in the case and those affecting his credibility. This rule was followed by our Court in the case of *People* v. *Lloyd* (1967), 5 Mich App 717, 722.

It appears to this Court under the facts in this case that prejudicial error was not committed by the trial court in permitting the rebuttal testimony for three reasons: (1) The defendant himself opened the door to such testimony when he stated on direct examination at the trial to the effect that he attempted on several occasions to tell the officers his true account of how the incident took place and that no one would listen to him. He also stated that he told Mr. Williams, the turnkey, the next day the entire story from beginning to end just the same as he told it from the witness stand. Mr. Williams was called by defendant but not questioned as to whether or not defendant had told him the account. The people, after the defendant had rested, called the detective who had talked with the defendant less than six hours after his arrest and gave him an opportunity to tell his story and at that time he told the officer that he had nothing to say. The defendant by placing himself on the witness stand voluntarily placed in issue his credibility. The rebuttal testimony rebutted his claim that he had tried to tell his claimed, true account of the incident but was not permitted to do so. (2) Following the last ruling by our Michigan Supreme Court as set forth in the *McCrea* case, *supra,* we must rule until otherwise mandated that the rebuttal testimony was admissible. (3) *Arguendo,* even considering that the cases cited by defendant forbid the rebuttal testimony here and that the testimony violated the defendant's constitutional rights under

the Fifth Amendment, we still rule that such claimed error was harmless beyond a reasonable doubt. The case against the defendant was not predicated upon circumstantial evidence but rather upon the testimony of the witnesses who identified Eugene Graham as the perpetrator of the crime charged. The facts are conclusive in that the overwhelming direct evidence placed Graham at the scene, identified him as the person who wielded the knife and as the one who had exerted physical control over the complainant in order to obtain the money. Having come to this conclusion, we determine that under the case of *Harrington* v. *California* (1969), 395 US 250, 251, 255 (89 S Ct 1726, 1727, 1729; 23 L Ed 2d 284, 286, 288)[3] the claimed error is harmless. Also see *People* v. *Wavie Williams* (On Rehearing, 1969), 19 Mich App 291.

Affirmed.

All concurred.

---

[3] "[N]ot all 'trial errors which violate the Constitution automatically call for reversal.'

\*　　\*　　\*

"The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of *Bruton* [v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476)] can constitute harmless error, we must leave this state conviction undisturbed."