PEOPLE *v.* ROLSTON
Opinion of the Court

1. Kidnapping—Preliminary Examination—Probable Cause.
    Probable cause existed at the preliminary examination to believe
    that a kidnapping had been committed and that the defend-
    ant had committed the crime where the evidence showed that
    the defendant, along with another man, handed the victim, a
    barmaid, a note, she and the defendant's companion went
    into an unoccupied room in which the victim's employer kept
    a large sum of money, the defendant joined them outside
    the bar when signalled to do so by his companion, the bar-
    maid was not seen alive after departing from the bar, she
    left behind an untended bar and personal belongings, and
    several hundreds of dollars of her employer's money was
    missing.

2. Constitutional Law—Privilege Against Self-Incrimination—
    Comment on Privilege.
    The constitutional privilege against self-incrimination protects
    a defendant from the introduction of evidence at his trial
    that he remained silent or claimed his Fifth Amendment
    privilege in the face of an accusation made after he was
    taken into custody (US Const, Am 5).

3. Constitutional Law—Privilege Against Self-Incrimination—
    Comment on Exercise—Scope of Right—Defendant Testifying.
    The constitutional privilege against self-incrimination protects
    a defendant, whether he testifies at trial or not, from the
    introduction of evidence at his trial that he remained silent

References for Points in Headnotes
[1] 21 Am Jur 2d, Criminal Law §§ 443, 444, 447, 449, 450.
[2] 21 Am Jur 2d, Criminal Law §§ 356, 366.
[3, 4] 21 Am Jur 2d, Criminal Law § 358.
[5] 21 Am Jur 2d, Criminal Law §§ 349–354, 360.
[6, 7] 21 Am Jur 2d, Criminal Law §§ 358, 367.
[8] 21 Am Jur 2d, Criminal Law §§ 357–359, 362, 367.
[9] 21 Am Jur 2d, Criminal Law §§ 159–167.

or claimed his Fifth Amendment privilege in the face of an accusation made after he was taken into custody, because it is intolerable that one constitutional right should have to be surrendered in order to assert another constitutional right (US Const, Am 5).

4. CONSTITUTIONAL LAW — DEFENDANT TESTIFYING — PRIVILEGE AGAINST SELF-INCRIMINATION — CROSS-EXAMINATION — SCOPE OF CROSS-EXAMINATION.

A defendant who chooses to testify at his trial subjects himself to cross-examination on what he says, on both inculpatory and exculpatory matters; however, it is not legally relevant that on an earlier occasion he chose to exercise his right against self-incrimination and remain silent (US Const, Am 5).

5. CONSTITUTIONAL LAW—PRIVILEGE AGAINST SELF-INCRIMINATION— SEVERABILITY.

The right to remain silent is severable, and, therefore, may be exercised on one occasion and waived on another (US Const, Am 5).

6. CONSTITUTIONAL LAW—PRIVILEGE AGAINST SELF-INCRIMINATION— STATEMENT BEFORE TRIAL—ADMISSIBILITY.

The prosecutor may introduce a statement made by the defendant before the defendant's trial at a time when the defendant chose not to exercise his constitutional right to remain silent, because such a procedure does not penalize the exercise of the constitutional choice to speak or remain silent.

7. CONSTITUTIONAL LAW—PRIVILEGE AGAINST SELF-INCRIMINATION— EXERCISE BEFORE TRIAL—EVIDENCE OF EXERCISE—ADMISSIBILITY.

Prosecutor's introducing into evidence and reading to the jury a transcript of the defendant's statement to the police in which the defendant exercised his constitutional right against self-incrimination by refusing to answer numerous questions was reversible error, even though the defendant took the stand at trial, because such a procedure chills the exercise of both the pretrial and the trial choices of whether to remain silent.

DISSENT BY GILLIS, J.

8. CRIMINAL LAW — PRIVILEGE AGAINST SELF-INCRIMINATION — DEFENDANT TESTIFYING — WAIVER — SILENCE BEFORE TRIAL.

*A criminal defendant who voluntarily takes the stand waives his right against self-incrimination and may be questioned as to*

*all other relevant facts, including his silence on prior occasions, because to hold otherwise would allow a defendant to fabricate his testimony without fear of impeachment and because the defendant's silence before trial may go to his credibility.*

9. CRIMINAL LAW—APPEAL AND ERROR—STANDARD OF REVIEW.
*A criminal conviction should be reversed only where it fairly appears that the defendant's rights have been prejudiced.*

Appeal from Wayne, John M. Wise, J. Submitted Division 1 February 3, 1970, at Detroit. (Docket No. 5317.) Decided February 26, 1971. Leave to appeal denied June 30, 1971, 385 Mich 760.

Robert Rolston was convicted of kidnapping. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*M. Glenn Grossman,* for defendant on appeal.

Before: LEVIN, P. J., and J. H. GILLIS and BRONSON, JJ.

LEVIN, P. J. The defendant, Robert Rolston, and Larry Markham were convicted of kidnapping by a jury.[1] Markham's conviction was affirmed by our Court upon a separate appeal.[2] This is Rolston's appeal; he raises a number of issues, but our disposition makes it unnecessary for us to consider all of them.

---

[1] MCLA § 750.349 (Stat Ann 1954 Rev § 28.581).
[2] See *People* v. *Markham* (1969), 19 Mich App 616, leave to appeal denied (1970), 383 Mich 804.

## I.

He contends, firstly, that the evidence presented at his preliminary examination was insufficient to support a finding of probable cause and that he should not have been bound over for trial.[3]

The people's evidence showed that the victim, Mrs. Kathleen Riddell, a trusted and responsible employee of Delaney's Great Lakes Bar, suddenly left her place of work without a word of warning to her employer or anyone else shortly after an exchange of communications with Markham and Rolston, who had earlier entered the bar.

Shortly after taking a seat at the bar, Rolston handed Mrs. Riddell a note. She thereafter accompanied Markham into an unoccupied room near where her employer kept a large sum of money; Markham emerged from the room and signalled Rolston to join him outside—Rolston did so. Mrs. Riddell was not seen alive after her departure from the bar. She left behind an untended bar and her personal belongings. Several hundred dollars of her employer's money was missing.

From these facts the magistrate could justifiably infer that it was more probable than not that her departure from the bar was involuntary, that she was forcibly removed, and he could properly conclude that there was probable cause to believe that the crime of kidnapping had been committed.[4]

---

[3] The defendant's attorney preserved this point for appeal by resisting the people's motion to bind the defendant over following the examination and by moving to quash the information before trial.

The rule in Michigan is that if the people fail to establish probable cause at the preliminary examination the defendant's conviction must be overturned even though additional evidence sufficient to support the magistrate's decision is subsequently developed at the trial. See *People* v. *Kennedy* (1968), 9 Mich App 346.

[4] See *People* v. *Spann* (1966), 3 Mich App 444, 455; *People* v. *Dellabonda* (1933), 265 Mich 486, 490; *People* v. *Karcher* (1948), 322 Mich 158, 163.

## II.

Rolston next contends, and we think with merit, that his Fifth Amendment right not to be compelled to incriminate himself was violated when the people were permitted to prove that he chose to exercise that right when the police attempted to question him.

Rolston surrendered to a lawyer on February 7, 1967, who, before turning him over to the police, took a stenographic statement from him. On the following day, February 8, when Rolston was in custody, the police sought to obtain a statement, but he declined to answer any questions, standing on his Fifth Amendment privilege.

Subsequently Rolston's lawyer gave the prosecutor a copy of the statement he had obtained from Rolston on February 7. At the trial the people introduced that statement into evidence. The people were then permitted to prove, over objection, by reading a transcript of the February 8 questioning, that Rolston had exercised his constitutional right to remain silent when the police questioned him; this was error.

It was the people, not defense counsel, who introduced Rolston's February 7 statement into evidence. There is nothing in the February 8 transcript at all inconsistent with the February 7 statement;[5] on February 8 Rolston, except for preliminary questions, refused to answer all questions.

Rolston's exercise of his constitutional privilege was stressed by reading several pages of the February 8 transcript which showed that he had repetitiously answered, "I don't care to answer that" or

---

[5] *Cf. People* v. *John Willie Williams* (1970), 26 Mich App 218, 226, fn 10, where we said that the rule which prevents questioning a defendant on his exercise of his Fifth Amendment right to remain silent does not preclude questioning him regarding a prior inconsistent statement.

words to that effect, in response to questions like:
Do you know Larry Markham? Did you see Larry
Markham on the night of January 23? Was Rol-
ston at the Great Lakes Bar that evening? Does
Rolston own an automobile? Where had he been
since January 23? Did he desire to make a state-
ment regarding the charged offense of kidnapping?
Did he know a bar maid who was employed at the
Great Lakes Bar? The apparent and only purpose
of reading the transcript was to incriminate Rol-
ston by showing that he had refused to answer those
pertinent questions.

The constitutional privilege against self-incrimi-
nation "protects an accused person from introduc-
tion at trial of evidence that he remained silent or
claimed that privilege in the face of an accusation
made after he was taken into custody". *People* v.
*Fry* (1969), 17 Mich App 229, 233.[6] While there is
authority in other jurisdictions that this rule does
not apply when the defendant takes the stand and
subjects himself to cross-examination, and there are
statements in opinions of our Court to the same
effect,[7] our Court has consistently held (*People* v.

---

[6] That the rule prohibiting comment on an accused's previous
silence or exercise of his Fifth Amendment privilege also applies to
pre-custody confrontations and accusations, see *People* v. *Bigge*
(1939), 288 Mich 417, 420.

[7] See *People* v. *Russell* (1970), 27 Mich App 654.

In *Russell*, the fact that the defendant had stood on his consti-
tutional privilege was shown during his cross-examination, not, as
here, before the defendant took the stand. Rolston did not testify
until after the people brought out, during their case in chief, that
he had exercised his constitutional privilege.

Also, in contrast with *Russell*, Rolston made no statement before
the trial inconsistent with either his trial testimony or his declination
to answer questions on February 8; the February 8 transcript does
not contradict the February 7 statement introduced by the people.

Further, since Rolston's at-trial defense of coercion was consistent
with his February 7 statement, his failure to answer questions on
February 8 was not even of probative value.

The statement from *People* v. *Graham* (1971), 29 Mich App 528,
quoted in Judge J. H. GILLIS' opinion was one of three alternative
grounds of decision; one of the other two being that the defendant

*Hicks* [1970], 22 Mich App 446; *People* v. *Seales*
[1969], 16 Mich App 572; *People* v. *John Willie
Williams* [1970], 26 Mich App 218, 230) that the
rule of constitutional law which protects an accused
person who does not take the stand against proof
that he exercised his Fifth Amendment right in the
face of accusation protects as well a defendant who
exercises his separate constitutional right[8] to take
the stand and testify in his own behalf. Relevant
in this connection is the principle that it is "intoler-
able that one constitutional right should have to be
surrendered in order to assert another".[9]

An accused person who chooses to take the stand
does, indeed, subject himself to cross-examination;
what he says as a witness, inculpatory and exculpa-
tory, must be carefully scrutinized—he is no longer

---

himself opened the door to the testimony when he stated on direct
examination that he attempted on several occasions to tell the officers
his account of how the incident took place and that no one would
listen to him, and the remaining reason being that, even if the defend-
ant's constitutional rights had been violated, the error was harmless
beyond a reasonable doubt.

In *People* v. *Shugar* (1970), 29 Mich App 139, also cited in Judge
J. H. GILLIS' opinion, the fact that the defendant had remained silent
at the police station was brought out on direct examination of the
defendant by his own attorney. In *Shugar* we said (p 145):

"In the case at bar, in contrast with *Seales*, defendant made no
objection to the questions at the time they were asked by the prosecu-
tion. Moreover, before the now objected to questions were asked,
the defendant's lawyer brought out on direct examination of the
defendant that he had exercised his constitutional right to remain
silent based upon the advice of counsel. Having explained this to
the jury himself, he cannot properly say that the additional ques-
tioning by the people prejudiced him."

[8] *Cf. In re Oliver* (1948), 333 US 257, 273 (68 S Ct 499, 507, 92
L Ed 682, 694); *MacKenna* v. *Ellis* (CA5, 1960), 280 F2d 592, 595,
cert den 368 US 877 (82 S Ct 121, 7 L Ed 2d 78); *Ferguson* v.
*Georgia* (1961), 365 US 570 (81 S Ct 756, 5 L Ed 2d 783).

[9] *Simmons* v. *United States* (1968), 390 US 377, 394 (88 S Ct 967,
976; 19 L Ed 2d 1247, 1259). Other cases holding unconstitutional
rules that needlessly penalize assertion of constitutional rights in-
clude *United States* v. *Jackson* (1968), 390 US 570, 583 (88 S Ct
1209, 20 L Ed 2d 138); *Groshart* v. *United States* (CA9, 1968), 392
F2d 172, 180; *People* v. *Luna* (1967), 37 Ill 2d 299, 308 (226 NE2d
586, 590); *Griffin* v. *California* (1965), 380 US 609, 614 (85 S Ct
1229, 14 L Ed 2d 106).

silent. But it is impertinent, not legally relevant, that on an earlier occasion he made a different choice, that he *then* chose to remain silent.

The right to remain silent is severable, that is, it may be exercised on one occasion and waived on another, or *vice versa, viz.:* the refusal of an accused person to answer questions before trial does not preclude him from taking the stand at the time of trial; on the other hand, even if he makes a statement before the trial he may decline to testify at his trial.[10]

True, if the accused makes a statement before the trial (*e.g.,* Rolston's February 7 statement later turned over to the police), it may be shown in evidence at trial without regard to whether he testifies.[11] This subjects the accused to possible adverse conclusion by the trier of fact based on what the accused said when he did *not* assert the privilege to remain silent; that does not penalize free assertion of this constitutional privilege. It would, however, penalize assertion of this privilege to permit the people to challenge those accused persons who take the stand for asserting it.

It unnecessarily and, therefore, impermissibly chills exercise of both the pretrial and the trial choice of whether to speak or to remain silent and the trial choice of whether to testify, to allow the people to challenge an accused person who testifies in his own behalf by showing—here, even before he took the stand—that before trial (*i.e.,* at a different time and place) he exercised his severable right to remain silent.[12]

---

[10] See *People* v. *James* (1971), 29 Mich App 522.

[11] See *People* v. *James, supra,* where we held that the transcript of a defendant's testimony at his preliminary examination was admissible at his trial even though he did not testify at his trial.

[12] The people have not claimed that the error is harmless. The record is voluminous; accordingly, we have not attempted to evaluate

### III.

Rolston raises another issue, one that may arise again upon the retrial. While we now advert to it, we do not think the record is adequate to permit definitive consideration.

Before and after his preliminary examination on February 16, 1967, Rolston shared a cell with one Daniel Brome. Brome testified at the trial that Rolston told him before February 16 that Larry Markham forced him at gunpoint to participate in the kidnapping of Mrs. Riddell; this was entirely consistent with Rolston's trial testimony—indeed his defense was that his participation was coerced.

When Brome attempted to testify concerning certain confidences which Rolston shared with him after February 16, Rolston's attorney objected. He claimed that on February 16 Brome became an agent for the police and that his task was to obtain inculpatory information from Rolston. In this connection it is relevant that Rolston was represented

the harmlessness of the error without the benefit of briefs of counsel directed to that issue.

We observe, however, that Rolston's presence during the commission of the crime of kidnapping Mrs. Riddell was admitted by him, as were the essential facts and circumstances of that offense. Rolston's defense was that his participation was coerced by Markham. Whether his defense would succeed turned largely on the jury's appraisal of Rolston's credibility. It would be difficult to say, in a case where the critical issue is credibility, that we are convinced that innuendo of the kind injected by the prosecutor through the reading of the February 8 transcript was harmless beyond a reasonable doubt. See *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284).

If such error is harmless in a case where there is no significant evidence on the critical issue in the case other than the testimony of the defendant and another interested witness (Markham), then the error would, as a matter of law, become harmless "beyond a reasonable doubt" in almost every case; it would be tantamount to saying that the error is never reversible error. The rule of law that the jury, not the appellate or trial court, is the judge of the credibility of the witnesses cuts both ways; we become thirteenth jurors for this purpose only when a motion for a new trial has been filed. See *Dyer* v. *MacDougall* (CA2, 1952), 201 F2d 265, 271, 272 (Frank, J., concurring).

by an attorney throughout the period when he was incarcerated with Brome.

Brome reported to the police on February 16, the day of Rolston's preliminary examination, that Rolston was talking. The record is unclear whether Brome expected or was offered or received any consideration from the people for reporting post-February 16 conversations. At the trial he denied he was motivated by a hope that he would be dealt with more leniently, but in response to questions as to whether it was not a fact that he was hopeful that if he cooperated the police would make a "deal" or give him a "break", he responded that one of the detectives may have said that and, also, that another officer said he "would see what he could do". The charges against Brome were dismissed before Rolston's trial.

Although the people contended at the trial that Brome should be allowed to testify concerning the post-February 16 conversations, the assistant prosecuting attorney eventually announced that he would not, in view of Rolston's lawyer's objections, question Brome further regarding those conversations. Evidence of the conversations was, nevertheless, introduced in response to questions put by Markham's counsel. Parenthetically, while Markham's and Rolston's defenses were inconsistent, no motion for a separate trial was made in Rolston's behalf.

In *Massiah* v. *United States* (1964), 377 US 201 (84 S Ct 1199, 12 L Ed 2d 246), the United States Supreme Court ruled that it was an infringement upon a defendant's Sixth Amendment right to the assistance of counsel to use against him at his trial (p 206) "evidence of his own incriminating words, which Federal agents had deliberately elicited from him [through a codefendant who had been wired for

sound] after he had been indicted and in the absence of his counsel".

Clearly the *Massiah* rule does not protect an accused person from betrayal of information confided before the police become aware of the confidant's willingness to become an informer.[13] It is also clear, however, that, if information is imparted after charges have been lodged against an accused person and he is represented by counsel, its use would not necessarily be justified merely because the information was knowingly confided by the accused to another person, not merely overheard by means of a microphone secretly installed by the police.

In *United States, ex rel. Milani,* v. *Pate* (CA 7, 1970), 425 F2d 6, it was determined that the informer's testimony related only to conversations that took place before he agreed with the police to report further conversations; decision on the question with which we are concerned was, therefore, unnecessary.[14] Nevertheless, the majority of the Seventh Circuit panel declared that admissibility of this variety of informer testimony turns on whether the police encouraged the informer to continue to insinuate himself into the confidence of the accused person or whether they were passive beneficiaries of a totally uninspired effort of the informer. One judge, concurring separately, indicated that he would hold that once the police learn that an accused person represented by counsel is confiding in an informer and they make it possible for the accused to continue so to share his confidences, the informer should be deemed to be the agent of the police even though he is not actively encouraged.

---

[13] *Stowers* v. *United States* (CA 9, 1965), 351 F2d 301; *People* v. *Milani* (1968), 39 Ill 2d 22 (233 NE2d 398).

[14] The Seventh Circuit Court rejected Milani's petition for a writ of habeas corpus. See fn 13 for citation to the earlier opinion of the Illinois Supreme Court affirming Milani's conviction.

In other cases it has been held that the *Massiah* rule applies even when the post-indictment statements obtained by the government agent were not "deliberately elicited by interrogation or induced by misapprehension engendered by trickery or deception".[15]

The issue is one on which we are in doubt. The record in this case is far from clear as to the character of the conversations on February 16 between Brome and the police and the other surrounding circumstances. We think it would be better to defer consideration of the question until it is determined more precisely how passive or encouraging the police were when Brome made it known to them that Rolston was talking.[16]

Reversed and remanded for a new trial.

---

[15] See *Hancock* v. *White* (CA 1, 1967), 378 F2d 479, 482; *People* v. *Milani, supra,* pp 401, 402.

In *Beatty* v. *United States* (1967), 389 US 45 (88 S Ct 234, 19 L Ed 2d 48), the United States Supreme Court reversed *Beatty* v. *United States* (CA 5, 1967), 377 F2d 181. The Fifth Circuit had attempted to distinguish *Massiah* on the ground that the defendant Beatty had sought the interview with the informer while Massiah had been induced to talk by the informer; the Fifth Circuit had declared that the *Massiah* (p 189) "rule only applies to those statements induced or deliberately elicited by officers or their agents from the accused after his indictment while he is without assistance of counsel." The Supreme Court reversed *per curiam* and without opinion citing *Massiah.* We also note that the fact that the informer in *Beatty* went to work for the police before indictment and was allowed to relate pre-indictment conversations was not treated as a relevant factor in determining the admissibility of his post-indictment conversations.

[16] See *Stowers* v. *United States, supra,* where the United States Court of Appeals for the Ninth Circuit refused to infer that Federal officers moved a cellmate to act in their behalf from evidence showing that the cellmate was interviewed by Federal officers on the day before his conversation with the defendant Stowers and was released on bail on the second day after the questioned conversation.

In *Stowers,* as here, the informer and the accused person were cellmates; in *Milani* they were fellow inmates, but the intimacy of sharing a cell was lacking. There was no finding in *Stowers* that the cellmate had agreed with the police to report further conversations with Stowers; in this case, in contrast, the evidence is clear that Brome did agree to report further conversations with Rolston.

Bronson, J., concurred.

J. H. Gillis, J. (*dissenting*). Once again Judge
Levin and I are on opposite ends of the judicial
spectrum. Broadly stated, the question presented
in Part II of this case is the same as that which di-
vided us in *People* v. *Russell* (1970), 27 Mich App
654.

Although Judge Levin purports to distinguish
*Russell* in footnote 7 of his opinion, I find the sug-
gested distinctions of no decisional significance.
With all deference, I must dissent.

In *Russell,* we held that where a defendant vol-
untarily takes the witness stand, he waives his right
against self-incrimination and may thereafter be
questioned as to all other relevant facts, including
his silence on a prior occasion. We reasoned that
to hold otherwise would allow a defendant to fab-
ricate his testimony on the stand without fear of
impeachment under cross-examination. That a de-
fendant remained silent on an earlier occasion,
where such silence undermines the credibility of
defendant's testimony at trial, is both relevant and
legally admissible. See *People* v. *Russell, supra,* p
662; *accord, People* v. *McCrea* (1942), 303 Mich 213;
*People* v. *Graham* (1971), 29 Mich App 528.

In the present case, defendant voluntarily took
the stand on his own behalf and related the same
exculpatory story which had been given to the police
by his lawyer on February 24. The February 8
transcript was offered to show that on an earlier
occasion, one closer to the time of defendant's ar-
rest, Rolston, although given the opportunity to do
so in the presence of his counsel, had nothing to say.
The situation is thus comparable to that presented
in *People* v. *Graham, supra,* where a unanimous
panel of this Court held (p 538):

"The people, after the defendant had rested, called the detective who had talked with the defendant less than six hours after his arrest and gave him an opportunity to tell his story and at that time he told the officer that he had nothing to say. The defendant by placing himself on the witness stand voluntarily placed in issue his credibility. The rebuttal testimony rebutted his claim that he had tried to tell his claimed, true account of the incident but was not permitted to do so. * * * Following the last ruling by our Michigan Supreme Court as set forth in the *McCrea* case, *supra,* we must rule until otherwise mandated that the rebuttal testimony was admissible."

The result in the present case should be the same. And this is true notwithstanding the fact that the February 8 transcript was read into the record as part of the people's case.[1]

More fundamentally, there is an additional reason why I regard admission of the February 8 transcript as not requiring reversal of defendant Rolston's conviction.

It has always seemed to me to be the law—constitutional or otherwise—that we should reverse a criminal conviction only where it fairly appears that defendant's rights have been prejudiced. In short, I am prepared to reverse but only when satisfied that defendant did not receive a fair trial. The words of Mr. Justice Cardozo, recently reiterated in *Dutton* v. *Evans* (1970), 400 US 74, 89, 90 (91 S Ct 210, 220, 27 L Ed 2d 213, 227), are appropriate in the present context:

---

[1] The February 8 transcript was read at trial after the people had introduced into evidence Rolston's exculpatory statement given to the police on February 24. There was no objection from the defense to a reading of the exculpatory statement. The trial court was of the view that fair play to both sides then required giving the people a chance to show that, on an earlier occasion, defendant remained silent although the natural inclination would have been to relate the same exculpatory story. I share the trial court's view.

" 'There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.' "

The majority reverse defendant Rolston's conviction on the theory that reference to his refusal to answer questions on February 8 impermissibly suggested to the jury that defendant was guilty of the crime charged. In *People* v. *John Willie Williams* (1970), 26 Mich App 218, 229, the Court, *per* Judge Levin, quoting *People* v. *Hicks* (1970), 22 Mich App 446, 452, stated the rationale for reversal as follows:

" 'Juries composed of ordinary laymen not trained in the law tend to associate the exercise of the Fifth Amendment privilege with guilt rather than possible innocence and exposure to ambiguous compromising situations.' "

The Court continued (*Williams,* p 230):

"The tacit admission argument is a legally impermissible argument. It is just as impermissible to argue to the jury that it may infer guilt from silence as it would be to argue that it may infer guilt from a failure to take the stand.

\*          \*          \*

"Howsoever the impermissible innuendo is injected it penalizes the defendant for exercising his constitutional right to remain silent and, therefore, chills exercise of that right."

In this case I find nothing in the record warranting any suggestion that the jury was asked to draw an inference of guilt from defendant Rolston's refusal to answer questions on February 8. In my

view, the possibility of the jury drawing the "impermissible innuendo" was gossamer at best. But for the one permissible reading of the February 8 transcript (reproduced in full in Appendix A), defendant's silence was never mentioned again, either in cross-examination of the defendant by the people or in the people's closing argument. When read as a whole, the transcript expressly indicates that defendant Rolston was silent on the 8th on account of the advice of counsel, not because of any innuendo of guilt. Under these circumstances, a panel of this Court, including my Brother Levin, has held that there is no violation of defendant's right to remain silent. See *People* v. *Shugar* (1970), 29 Mich App 139. Again, the result in the instant case should be the same.

Finally, we should not so lightly disregard the trial judge's immediate charge to the jury informing it of defendant's right to remain silent. See Appendix A. Apparently defendant's counsel, who had requested the charge, was satisfied. No motion for a mistrial was ever filed.

As to other issues raised by defendant on appeal, I am of the opinion that they are likewise without merit. This includes the question discussed, but left unanswered, in Part III of the majority opinion.

The trial judge specifically found that Brome was not acting as an agent for the police, that he neither expected, nor was he offered any consideration for reporting post-February 16 conversations. I do not believe, as do the majority, that the record is unclear on this point. Moreover, the trial court's conclusion is supported by record testimony and not clearly erroneous.

I would affirm defendant's conviction.

APPENDIX A

During the colloquy between the trial court and counsel on the question of the admissibility of the February 8 transcript, the trial judge made these comments:

*"The Court:* Let the record indicate that the witness, Inspector Schattler, was about to testify relative to a statement allegedly given to Assistant Prosecutor Mowatt. I may say that this statement is only as to the defendant Rolston. Counsel for defendant Rolston, Mr. Otis, is objecting thereto and asked for a conference with the court at the bench before we adjourned to chambers. This objection is that the statement is not admissible. Also, that he had not received notice of such a statement. The record will show that the statement of defendant Rolston has already been introduced, which was taken by Mr. Otis and presented to the prosecutor's office.

"I agree with you, Mr. Otis, that he has a right not to make a statement and he is informed of that at the time. However, in this particular instance, but had he not made a statement at all, I'll tell you right now, I would not have allowed this type of procedure; but in view of the fact that the defendant has made a statement subsequent to this date, a self-serving statement—even counsel for the defendant indicated it was self-serving—but in view of the fact that he did make a statement in his counsel's office, which was presented to the police department and the prosecuting attorney's office, I'm going to allow the statement that he made if his constitutional rights were protected.

\* \* \*

*"Mr. Otis:* I'm going to ask the court to instruct the jury that Mr. Rolston was under no obligation whatsoever to make a statement.

\* \* \*

*"The Court (interposing):* Let me point something out. Your strategy in this cause has been evidence of the defendant and with this you're going to show how your fine client cooperated with the police, gave them a statement that he's an innocent lad.

\*     \*     \*

*"The Court:* I'm going to allow it in, but I'll instruct the jury he had the right to remain silent."

Thereafter, Inspector Schattler resumed the stand and testified as follows:

*"By Mr. Eggleton [assistant prosecutor]:*

*"Q.* Mr. Schattler, at the time that Mr. Rolston [*sic*] was brought before the prosecuting attorney, Mr. John A. Mowatt, was he advised of his constitutional rights?

*"A.* Yes, sir, he was. His attorney was present.

*"Mr. Otis:* That would go to conclusion. If there's a statement, may the statement be read.

*"The Court:* Counsel's position is well taken.

*"Mr. Eggleton:* Thank you, your Honor.

*"Q.* Would you read that portion of that statement regarding the constitutional rights, sir?

*"A.* Should I read it?

*"Q.* Begin reading it and I'll tell you when to stop.

*"A.* 'Statement of Robert Lee Rolston, in the presence of Sheldon Otis, attorney, taken in the office of the prosecuting attorney for the County of Wayne, out-county branch at Westland, Michigan, on Wednesday, February 8, 1967, at about 2:40 p.m., by Mr. John A. Mowatt, assistant prosecuting attorney, in the presence of Inspector Raymond Schattler and Detective Gene Barnes, River Rouge Police Department, Elizabeth J. Ponczek, criminal testimony stenographer.

*" 'By Mr. Mowatt:*

*" 'Q.* And your full name, Mr. Rolston?

*" 'A.* Robert Lee Rolston.

" 'Q. Is that R-o-l-s-t-o-n? And your age?

" 'A. 30.

" 'Q. And your address?

" 'A. Box 117, Versailles, Indiana.

" 'Q. My name is John Mowatt. I am one of the assistant prosecuting attorneys of Wayne County. I want to talk to you regarding your conduct and behavior on the evening of January 23 of this year. Do you understand, Mr. Rolston, anything you tell us this afternoon can be used against you on a trial?

" 'A. Yes, sir.

" 'Q. You understand that. And your attorney, Mr. Sheldon Otis, is with you?

" 'A. Yes, sir.

" 'Q. And you understand, Mr. Rolston, that you don't have to make any answers to my questions until you have consulted with your attorney?

" 'A. Yes.

" 'Q. You understand that?

" 'A. Yes.

" 'Q. And you also understand that if you are unable to afford an attorney, the County of Wayne will supply you with one?

" 'A. Yes.

" 'Q. And has anyone promised you anything to make this statement? I mean to make a statement, to answer my questions?

" 'A. No.

" 'Q. Has anyone threatened you in any way to make this statement?

" 'A. No.

" 'Q. Do you know a Larry Markham?'

"*Mr. Eggleton:* Thank you, stop right there. I submit this adequately covers the area of advice concerning the constitutional rights of the defendant.

"*Mr. Otis:* I'll object to the speech by the prosecutor, your Honor, and ask that this statement be finished.

"*The Court:* Do you wish to proceed with this statement?

"*A.* Yes.

"*Mr. Eggleton:* Continue on.

"*A.* The last question was:

" '*Q.* Do you know a Larry Markham?

" '*Sheldon Otis (interjecting)*: Mr. Mowatt, I think I should interject at this point. I advised Mr. Rolston not to make any statement concerning anything other than to give you information concerning his name and address, *et cetera,* and I would appreciate if you would respect that instruction. I have also asked the River Rouge Police, as well as the FBI agents who have participated in this, not to question, interrogate, interview or in any way investigate the person of Mr. Rolston without my presence and so far they have all cooperated in respecting that wish, and I would appreciate the same from the Wayne County prosecutor's office.

" '*Q.* Well, you do not desire Mr. Rolston to answer any of my questions, except what he has already answered, is that it?

" '*Sheldon Otis:* That is correct, unless if you choose to ask questions and we would see whether on individual questions I would advise him to answer, that's up to you.

" '*Q. (to Robert Lee Rolston)*: Do you know a Larry Markham?

" '*Sheldon Otis:* (No response.)

" '*A. (by Robert Lee Rolston)*: (No response.)

" '*Q.* You don't want—

" '*Sheldon Otis (interrupting)*: Let me put it this way. If I, if I advise Mr. Rolston, I will do so orally, and my silence means that he does not choose to answer any questions.

" '*Q. (to Robert Lee Rolston)*: Do you know a Larry Markham?

" '*A. (by Robert Lee Rolston)*: (No response.)

" '*Sheldon Otis:* (No response.)

" '*A. (by Robert Lee Rolston)*: I don't care to answer that.

" '*Q.* Did you see a Larry Markham on that particular night, January 23?

" '*A.* I don't care to answer that.

" '*Q.* Were you at the bar, Great Lakes Bar in River Rouge that evening?

" '*A.* I don't care to answer that.

" '*Q.* Do you own an automobile?

" '*A.* Can't answer that.

" '*Q.* You do not want to answer my questions, is that right? Where have you been since January 23 of this year?

" '*A.* I can't answer that.

" '*Q.* You understand that you are being charged with the crime of kidnapping?

" '*A.* Yes.

" '*Q.* You want to make any statement regarding that particular charge?

" '*Q.* Did you know a barmaid who was employed at the Great Lakes Bar?

" '*A.* I can't answer that.

" '*(Stenographer to Robert Lee Rolston:* "I can't" or "I don't care to answer that?")

" '*A.* I ain't, no.

" '*Q.* Were you employed for—

" '*A. (interrupting)*: Can't answer that.

" '*Mr. Mowatt:* Might as well—okay.'

"That's it. That's the end of the statement.

"*Mr. Eggleton:* Thank you. Now, it's your testimony this statement was taken two weeks before the other statement was brought in by Mr. Otis. Is that correct?

"*A.* Yes, sir, that's correct.

"*Q.* Now, sir, as to the additional clothing taken from Mr. Markham, did you bring those officers in today?

"*A.* Yes, sir, I have them here.

*"Q.* Thank you, sir, you may cross-examine.

*"Mr. Otis:* Your Honor, before proceeding with any questions, I would ask the court to appropriate instructions concerning this matter at this time.

*"The Court:* Ladies and gentlemen of the jury, under the United States Constitution, anyone who is in custody charged with an offense or investigation of an offense, has the constitutional right to remain silent and it's not to be used in any manner whatsoever. So, if a person remains silent and doesn't wish to answer any questions, they have the constitutional right to take that position, and I am instructing you regarding this at this time because of the statement that was just made into the record.

*"Mr. Otis:* Thank you, your Honor."